IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2013 JUL -3 P 5: 19

WILLIAM F. HASSAY, JR.,

    *Plaintiff,*

    v.

                  Civil Action No.: ELH-13-1076

MAYOR & CITY COUNCIL OF
OCEAN CITY, MD, *et al.*,

    *Defendants.*

## MEMORANDUM OPINION

During every summer from 1995 until June 2012, plaintiff William F. Hassay, Jr., an accomplished violinist, performed as a "street artist" on the beachfront boardwalk in Ocean City, Maryland. On June 22, 2012, Hassay was warned by an Ocean City police officer that the volume of his music violated an Ocean City noise ordinance enacted in February 2012, which prohibited, *inter alia*, the audibility of musical instruments and amplified sound at a distance of greater than thirty feet. *See* Ocean City's "Code of Ordinances" ("City Code"), Part II, Ch. 30, Art. V, Div. 2 § 30-272(2)(b) (the "30-Foot Audibility Restriction"). Faced with the threat of arrest, three months' imprisonment, and a $500 fine, Hassay never returned to the boardwalk to perform.

On April 10, 2013, Hassay filed suit (ECF 1) against the Mayor and City Council of Ocean City, Maryland and Michael Colbert, in his official capacity as Acting Police Chief of the Ocean City Police Department ("OCPD"),[1] claiming that the 30-Foot Audibility Restriction violated plaintiff's rights under the First Amendment. Pursuant to Fed. R. Civ. P. 65, plaintiff

---

[1]According to defendants, the current Acting Chief of Police is Gregory Guiton. *See* Defendants' Response and Opposition to Plaintiff's Motion for Preliminary Injunction at 1 n.1 (ECF 20).

also filed a motion for a preliminary injunction (ECF 2), along with a supporting memorandum of law (ECF 2-1) (collectively, the "Motion"), seeking to enjoin the enforcement of the 30-Foot Audibility Restriction on the boardwalk during the pendency of the case. Defendants opposed the Motion ("Opposition" or "Opp.," ECF 20), and plaintiff replied ("Reply," ECF 22).

The Court held a hearing on the Motion on June 10, 2013, at which the parties presented evidence and argument. In addition to his own testimony, plaintiff presented the testimony of Gary Ehrlich, an expert in acoustics; Mark Chase, a spray paint artist who performs on the boardwalk; and Alex Young, a singer/guitarist who performs on the boardwalk. Defendants presented the testimony of Mayor Richard W. Meehan, who has served as the Mayor of Ocean City since 2006; James Grady, Acting Lieutenant of the OCPD; Vickers Cooper Barrett, the owner of a bed and breakfast located adjacent to the boardwalk; and Milton Dean, a keyboard player who performs on the boardwalk.

For the reasons that follow, I will grant the Motion.

## I. Factual Background[2]

### A. Ocean City and its Boardwalk

Ocean City, one of Maryland's major summer destinations, is a beachfront community located on Maryland's Eastern Shore. Situated on a long, narrow spit of land, the City runs north-south along the Atlantic Ocean. It extends for several miles along the coast (*i.e.* north-south), but is only a few city blocks wide (*i.e.* east-west), even at its widest point.

---

[2] The facts are gleaned from the parties' exhibits and the testimony. In addition, I take judicial notice of some basic geographic information that is widely known within Maryland. *See, e.g., United States v. Johnson*, 726 F.2d 1018, 1021 (4th Cir. 1984) (geographical information that is "'generally known within the territorial jurisdiction of the trial court'" is "especially appropriate for judicial notice") (citations omitted); *Davenport v. City of Alexandria*, 710 F.2d 148, 151 (4th Cir. 1983) (same). Quotes attributed to a witness are not necessarily the precise words of the witness, as I do not have a transcript of the testimony. Instead, they are based on my notes from the hearing.

The easternmost platted street in Ocean City is Atlantic Avenue, which is also known as the boardwalk. The boardwalk is a wooden pedestrian walkway that is sandwiched between the ocean beach and the paved streets of Ocean City. It is approximately three miles long, running from South Second Street in the south to about 22nd Street in the north. A popular tourist attraction, the boardwalk features the beach and ocean on its eastern side, and is lined with shops, eating establishments, and tourist attractions on its western side. Hotels, apartments, and condominiums also lie along the western side of the boardwalk. Mayor Meehan testified that it is approximately thirty feet wide at most points.

In addition to a wide variety of stores and food vendors, the boardwalk is also known for its "street performers." According to Mayor Meehan, the boardwalk's street performers are also "part of the ambience." An Ocean City public advisory states that street performers "materialize daily to put on shows, create balloon sculptures, draw caricatures, or just strum a guitar." Plaintiff's Exh. 1[3]; *see also* OCPD Public Advisory Regarding Street Performers and the New Noise Ordinance, *available at* http://oceancitymd.gov/Police/media/ocpd-public-advisory-regarding-street-performers-and-the-new-noise-ordinance/ (last visited June 19, 2013).

*B. Ocean City's Noise Ordinance*

Ocean City regulates noise through a variety of ordinances, codified in the City Code at Part II, Chapter 30, Article V, titled "Noise" (collectively, the "Noise Ordinance"). Division 2 of the Noise Ordinance is titled "Unreasonably Loud Noise."[4] It contains three sections: 30-271, 30-272, and 30-273. A violation of the provision is a misdemeanor offense, "punishable by a fine of not more than $500.00, and/or . . . imprison[ment] for a term not to exceed three months." City Code, Part II, Ch. 1 § 1-8 ("Violations and penalties").

---

[3] Exhibit A to Hassay's Affidavit (ECF 2-2) is identical to Plaintiff's Exhibit 1.

[4] Division 1 is "Reserved" and contains no provisions at this time.

Section 30-271 is titled "Prohibited." It provides, *id.*:

> It shall be unlawful for any person to make, continue or cause to be made or continued any unreasonably loud noise or any noise which either annoys, disturbs, injures or endangers the comfort, repose, health, peace or safety of others within the corporate limits of Ocean City.

Section 30-272 is titled "Prohibited noises enumerated." It "declare[s]" that certain acts constitute "unreasonably loud noises." *Id.* These noises are divided into four categories, two of which are pertinent here: "Use of radios, phonographs and musical instruments," addressed in § 30-272(2); and "Yelling, shouting, hooting, whistling and singing," addressed in § 30-272(3).[5]

The 30-Foot Audibility Restriction challenged by Hassay is codified at § 30-272(2)b, under the category of "radios, phonographs and musical instruments." Passed by the Ocean City Council on February 6, 2012, it is the most recent addition to Division 2's prohibition of "unreasonably loud noise." It states:

> The following acts, among others, are hereby declared to be unreasonably loud noises in violation of this division:
>
>     \*      \*      \*
>
> (2) Use of radios, phonographs, and musical instruments.
>
>     \*      \*      \*
>
> b. The using of, operating of or permitting to be played, used or operated any radio receiving set, musical instrument, phonograph, sound amplification system or other machine or device for the producing or reproducing of sound on or directed toward a public beach, the boardwalk, streets or other public ways at any time in such a manner as to be plainly audible at a distance of 30 feet from the source of such sound which is deemed to be unreasonably loud so as to disturb the peace, quiet and comfort of other persons or at a louder volume than is necessary for the convenient hearing of the individual carrying the instrument, machine or device or those individuals immediately adjacent thereto and who are voluntary listeners thereto.

---

[5] The other two categories are "[t]he sounding of any horn or signaling device on any automobile, motorcycle or other vehicle," Noise Ordinance § 30-272(1), and noise generated by "any boat or other water vessel." Noise Ordinance § 30-272(4). Neither category is relevant to this case.

Section 30-272(2) provides two additional audibility restrictions under "radios, phonographs and musical instruments." With respect to sound produced from a "room, vehicle or chamber," § 30-272(2)a prohibits:

> The using of, operating of or permitting to be played, used or operated any radio receiving set, musical instrument, phonograph or other machine or device for the producing or reproducing of sound in such a manner as to disturb the peace, quiet and comfort of the neighboring inhabitants or at any time with louder volume than is necessary for convenient hearing for the person or persons who are in the room, vehicle or chamber in which such machine or device is operated and who are voluntary listeners thereto.

Additionally, § 30-272(2)c provides an audibility restriction for sound generated by "a machine or device," emanating from a "building, structure or vehicle" between midnight and 7:00 a.m. It prohibits:

> The using of, operating of or permitting to be played, used or operated any radio receiving set, musical instrument, phonograph or other machine or device for the producing or reproducing of sound between the hours of 12:00 midnight and 7:00 a.m. in such a manner as to be plainly audible at a distance of 50 feet from the building, structure or vehicle in which it is located.

As noted, § 30-272(3) is titled "[y]elling, shouting, hooting, whistling or singing." Section 30-272(3)a prohibits:

> Yelling, shouting, hooting, whistling or singing on the public streets or public areas or from private property at any time or place so as to annoy or disturb the quiet, comfort or repose of persons in any dwelling, hotel or other type of residence or any persons in the vicinity, between the hours of 7:00 a.m. and 12:00 midnight, after having been warned to quiet or cease such noisemaking.

Section 30-272(3)b prohibits:

> Yelling, shouting, hooting, whistling or singing on public streets or public areas or from private property in such a manner as to be plainly audible at a distance of 50 feet from the public street, public area, building, structure or vehicle from which the noise emanates, between the hours of 12:00 midnight and 7:00 a.m.

Section 30-273, titled "Responsibility of owner of premises," was not addressed by the parties. It provides:

It shall be unlawful for any person to knowingly permit the making, creation or maintenance of unreasonably loud noises upon any premises owned or possessed by him or under his control.

## C. William F. Hassay, Jr.

Hassay is sixty-one years old and has been playing the violin for fifty-three years, including fourteen years as a First Violinist with the Alabama Symphony Orchestra. He has also performed with many regional symphony orchestras. Hassay began performing on the Ocean City boardwalk in the summer of 1995. His performances feature a variety of musical genres, from classical to rock, and combine acoustic violin with prerecorded music played through a small amplifier. Hassay's goal is to create a "dialogue" by blending the two sounds.

Hassay performs because he loves to "put music out and communicate emotions to people." To that end, when he is in Ocean City he plays exclusively on the boardwalk, because "that's where the people are." Hassay explained that there is a "loop between a performer and the audience, and that energy is why I do it." In addition, Hassay obtains income from his performances, by way of gratuities from the audience. During the summer, he typically plays five or six days per week, from about 3 p.m. until midnight. He testified that he has earned as much as approximately $25,000 in a season. Income from the boardwalk supplements his income from his job as a substitute teacher during the school year.

Although many people have expressed their appreciation to Hassay for his music, he admitted that some shops on the boardwalk have complained about the noise. But, whenever he received a complaint he changed locations or stopped altogether. He also noted that Ocean City ordinances strictly limit street performances to certain areas, *i.e.*, where the paved city streets intersect with the boardwalk, called "street ends." *See* City Code, Part II, Ch. 62, Art. I § 62-5(b)(1). And, performers are also prohibited from blocking stores, traffic, pedestrians, and the

6

trams. *See id.* § 62-5(b)(3); *see also* Plaintiff's Exh. 1 (explaining that "Street Performers cannot set up in an area that hampers visitors' ability to enter and exit stores, block pedestrian or vehicle traffic," and "Street Performers can only perform within the extended boundaries east of the street ends and cannot drift north or south of the street end area").

Prior to June 2012, Hassay had never been cited by Ocean City police for excessive noise. On June 18, 2012, however, an OCPD police officer approached Hassay and told him that the volume of his music violated the 30-Foot Audibility Restriction. Hassay responded that he was exercising his First Amendment rights, and showed the officer a 2009 letter from the American Civil Liberties Union ("ACLU"), which had been sent to Ocean City as part of the ACLU's successful challenge to a now-invalid permit requirement for amplified sound on the boardwalk.[6] According to Hassay, the officer advised him that the law had changed. A second officer who arrived on the scene handed Hassay a pamphlet outlining the 30-Foot Audibility Restriction. *See* Plaintiff's Exh. 1. The officer said that he would show the ACLU letter to his supervisors, and that it was "OK" for Hassay to continue playing on that occasion.

Hassay continued performing without incident until the evening of June 22, 2012, when he was confronted by Lt. Grady[7] and informed that the volume of his music violated the 30-Foot Audibility Restriction. Because Lt. Grady claimed that the music was "way too loud," Hassay stopped playing. Hassay claimed Lt. Grady told him that he had "used up" all of his warnings, and the next time someone complained about Hassay's music, Hassay would be cited. Hassay asked where he could play without getting cited, but Lt. Grady responded that he could not say.

---

[6] The letter was not introduced into evidence. I have referred to it only for background.

[7] Lt. Grady has been employed as an Ocean City Police Officer since approximately 1994. He serves as a Sergeant during the "off season," and was promoted to Acting Lieutenant for the summer. For the majority of his time as a police officer, Lt. Grady has worked the "evening shift," between 5 p.m. and 3 a.m.

As discussed, *infra*, Lt. Grady also testified about the incident. He stated that he heard Hassay from 100 feet away on the boardwalk, and 150 feet to the west of the boardwalk. He added that he responded to a noise complaint about plaintiff made by an individual at a nearby shop on the boardwalk.

Since that date in June 2012, Hassay has not returned to play his violin at the boardwalk, for fear of arrest or citation. Hassay testified that he would be unable to communicate any emotion with his music if he were to comply with the 30-Foot Audibility Restriction.

### D. Expert Testimony

At the hearing, plaintiff offered the testimony of Gary Ehrlich, who was accepted as an expert in acoustics. Ehrlich has worked as an acoustical engineer since 1991, and has previously evaluated sound levels for government entities, including noise from firing ranges and protests.[8] He testified about sound levels on the boardwalk generally, and the effect of the 30-Foot Audibility Restriction on plaintiff's ability to perform. Defendants did not offer any expert testimony.

Ehrlich visited the boardwalk twice in connection with this case: mid-day on Wednesday, March 20, 2013, and during the evening of Thursday, May 30, 2013. The boardwalk appeared "tranquil" during Ehrlich's March visit, and only a handful of stores were open. But, a "good number of tourists" were present in May, and all of the stores were open at that time. On both occasions, Ehrlich tested noise using a laser range finder and a sound level meter, both of which were calibrated beforehand.

---

[8] Among his various qualifications, Ehrlich is a member of several professional acoustics organizations, has written papers and given speeches on acoustics, and taught a class on acoustics at American University. Ehrlich has also testified multiple times on acoustics before administrative agencies, and has been received as an expert in acoustics by the Superior Court of Washington, D.C.

According to Ehrlich, three factors determine the audibility of sound: How a sound varies in time; how loud it is; and its pitch content/frequency. Determining audibility requires locating a steady sound and controlling for each of these variables.

To test the audibility of sound on the boardwalk, Ehrlich identified the source of a particular noise—such as someone walking—and then used the laser range finder to measure the distance to the source. In measuring audibility, Ehrlich was "conservative," requiring a sound to be "clearly audible" at a given distance. He found that "virtually every sound" was audible at a distance of more than thirty feet, including a conversation and the sound of someone walking in flip flops. According to Ehrlich's testing, the stores on the boardwalk were usually the loudest source of noise. They were audible at more than 100 feet, and up to at least 267 feet. Ehrlich also listened to a musician playing the harmonica and drums, who was audible at a distance of about 290 feet. He noted that seagulls were audible at a distance of 320 feet.

In addition, Ehrlich measured the boardwalk's ambient sound levels using a sound level meter. He found that the average sound level on the boardwalk was approximately sixty decibels. According to Ehrlich, for music to be intelligible to a listener at a distance of fifteen feet—the distance he estimated a crowd would form around a musician—the sound level must be at least ten decibels above the background noise. Accordingly, he concluded that a musician would need to play at a level of seventy decibels in order to be intelligible to an audience standing fifteen feet away. And, Ehrlich explained that music played at a level of seventy decibels would be "easily audible" at a distance of thirty feet, although he would not consider it excessively loud.

Ehrlich testified that for plaintiff's music to be *in*audible at thirty feet, the background noise would need to be ninety decibels. According to Ehrlich, the Occupational Safety and

Health Administration has determined that ninety decibels is the level at which there is a risk of damage to hearing. *See, e.g.*, OSHA, Safety & Health Topics, Occupational Noise Exposure, *available at* http://www.osha.gov/SLTC/noisehearingconservation/ ("With noise, OSHA's permissible exposure limit . . . is 90 dBA for all workers for an 8 hour day."). He considered it unlikely that the boardwalk's background noise level would reach ninety decibels, although he did not test the sound on the boardwalk at the peak of summer. In Ehrlich's words, ninety decibels is the approximate sound level a listener would experience in "the middle of a rock concert."

Ehrlich acknowledged that audibility varies with the surrounding environment. But, he testified that he had no reason to believe that his conclusions would be different if he conducted his tests on any other date. He also understood that the Ocean City Noise Ordinance limits the audibility of music to thirty feet, but limits the audibility of voices to fifty feet. Nothing in his experience indicated that a person would find noise generated by a musical instrument more annoying than noise generated by a human voice.

### E. Street Performers for Plaintiff

As noted, plaintiff also called Mark Chase, a spray paint artist, and Alex Young, a singer and guitarist, both of whom testified about the effect of the 30-Foot Audibility Restriction on their boardwalk performances.

i.    <u>Mark Chase</u>

Mark Chase has been performing "spray paint can art" on the boardwalk since 2010. He derives half of his income from the sales of his paintings, and performs daily between Memorial Day and late September, from about 1 p.m. until midnight.

Chase's performance consists of spray painting a canvas to music in front of his audience. *See generally Chase*, 825 F. Supp. 2d at 611-12 (describing Chase's performance). Chase uses music to set a "tempo," which helps him paint, and to add "ambience" for his painting. To generate the music, he uses a four-piece stereo unit, which includes a subwoofer and two speakers. Chase claimed that music is essential for his expression, and that he "remixes" music for his performances using software on his computer. In his words, the audience needs to "feel" the music to get the full effect of his art.

During the summer of 2012, Chase was warned "once every other day" about the volume of his music, and was told each time to turn it down. On one occasion, he received a citation for violating the 30-Foot Audibility Restriction. Although the citation was dismissed, he has reduced the volume of his music because he does not want to incur a $500 fine. His music is now "virtually off," and he wears headphones connected to his stereo because he cannot hear it. According to Chase, this prevents him from interacting with his audience, which is an essential part of his art. Thus, although he has continued to perform, Chase claimed that his art has been "hindered" by the restriction. Chase added that, in his experience, it is not feasible to comply with the noise ordinance because "at thirty feet, you can hear everything."

ii.　Alex Young

Alex Young, a 26-year-old singer and guitarist, has performed on the Ocean City boardwalk for approximately three years. He performs on the boardwalk because "that's where people are." His music allows him to "connect with people" and obtain monetary "donations." Young plays five or six times per week between Memorial Day and late September.

During the summer of 2012, Young was approached by the police eight or nine times due to the volume of his music, and threatened four or five times with a fine or arrest. Since

receiving these warnings, he has been worried about getting arrested. Although he continues to play, the restriction prevents Young from expressing himself fully. In his view, the 30-Foot Audibility Restriction is not reasonable.

### F. The "Battle of the Bands" and Enactment of the 30-Foot Audibility Restriction

According to defendants, the 30-Foot Audibility Restriction is justified by noise issues unique to the boardwalk. The defense witnesses all agreed that excessive noise on the boardwalk constitutes a significant issue.

Due to its popularity, the boardwalk can become quite congested during the summer, with crowds that are "shoulder to shoulder," according to Mayor Meehan. During the off-season, however, the boardwalk is "tranquil." The Mayor claimed that the large crowds and noise that come with summer can be "agitating to an awful lot of people." He maintained that Ocean City's administrators want everyone to be able to express themselves and to enjoy the boardwalk, although that "balance is hard to achieve."

According to both the Mayor and Lt. Grady, much of the noise on the boardwalk is generated by the shops, which use amplified music to compete for customers' attention. This competition has resulted in a "battle of the bands" scenario, with each shop trying to play its music more loudly than adjoining stores. The Mayor claimed that a similar "battle of the bands" takes place between street performers, who also compete to draw crowds. Lt. Grady added that although the boardwalk has a history of loud behavior, particularly at night, noise from shops and street performers has increased as a result of competition to attract customers. And, in the Mayor's words, visitors to the boardwalk are a "captive audience" to the noise.

Ms. Barrett owns a bed and breakfast located next to the boardwalk, and has received complaints from her guests about boardwalk noise.[9]  Though infrequent, the complaints generally pertain to the volume of music, which, in her words, "can become tiresome to a guest, who didn't choose to have to listen" to it.  For example, street performers occasionally play across from the bed and breakfast's veranda.  According to Ms. Barrett, the primary issue for her guests is the "repetition" and "longevity" of these performances.  Although patrons on the boardwalk do not necessarily spend a prolonged time with a street performer, hotel guests are often captive.  Ms. Barrett explained that guests who want to remain at the hotel but avoid the repetition of a boardwalk musical performance "have no choice" but to go inside, "which is not why they are there."  Ms. Barrett also testified that noise has become a more significant issue over recent years.  In addition to the boardwalk's ambient noise, she explained that there is now "competitive noise" from boardwalk businesses seeking to draw attention to their stores.

In February 2012, in response to the boardwalk's "battle of the bands" problem, the City Council enacted the 30-Foot Audibility Restriction.  The enactment followed discussions at four sessions of the City Council, which took place on December 13, 2011, January 10, 2012, January 17, 2012, and February 6, 2012.[10]  The concern that prompted the legislation was first raised by the Mayor at the City Council meeting on December 13, 2011.  *See* Video, Mayor & City Council Work Session (Dec. 13, 2011), at Pt. 1, 00:14:15-00:15:17, http://www.oceancitymd.gov/City_Clerk/videofiles/20111213.html (last visited July 3, 2013)

---

[9] Ms. Barrett is also the Chair of the Ocean City Development Corporation, which was started by merchants about eight years ago to enhance boardwalk life.  She is actively involved in promoting the arts.

[10] Video recordings of City Council meetings are made available by Ocean City at http://www.oceancitymd.gov/City_Clerk/Council_Videos.html (last visited July 3, 2013).

(statement of Mayor Meehan proposing discussions to address problem of sound amplification on the boardwalk).

As originally proposed, the ordinance would have imposed an audibility limit of fifty feet for music or amplified sound. *See* Town of Ocean City Clerk's Office, Agenda: Mayor & City Council – Regular Session, at 40, *available at*

http://www.oceancitymd.gov/City_Clerk/Agendas/2012/0117.pdf (last visited July 3, 2013); Video, Mayor & City Council Work Session (Jan. 17, 2012), at 00:49:20-00:50:03, http://www.oceancitymd.gov/City_Clerk/videofiles/20120117.html (last visited July 3, 2013). However, the City Council amended the provision to a distance of thirty feet, to conform to the lot sizes on the boardwalk, generally thirty feet wide, and because the benches on the boardwalk are approximately thirty feet from the front of each store. *See* Video, Mayor & City Council Work Session (Jan. 17, 2012), at 00:51:1-00:53:35,

http://www.oceancitymd.gov/City_Clerk/videofiles/20120117.html (last visited July 3, 2013) (discussing and approving amendment to thirty feet). By comparison, residential lots in Ocean City have a width of approximately fifty feet. According to the Mayor, the variation in lot size is the basis for the variation in restrictions, *i.e.*, the fifty-foot restriction in residential areas and the thirty-foot restriction for the boardwalk. *See also* Video, Mayor & City Council Work Session (Feb. 6, 2012), at Part 2, 00:30:28-00:31:13,

http://www.oceancitymd.gov/City_Clerk/videofiles/20120206a.html   (last visited July 3, 2013) (statement of Councilwoman Margaret Pillas) (explaining choice of thirty-foot distance).

Notably, the Mayor acknowledged that Ocean City applies a fifty-foot restriction to yelling, shouting, hooting, whistling or singing on the boardwalk, rather than a thirty-foot restriction. *See* Noise Ordinance § 30-272(3)b. The Mayor also conceded that Ocean City did

14

not consult with any acoustical engineers or obtain comments from street performers before determining the suitability of the 30-Foot Audibility Restriction. Nor was testing undertaken to assess the feasibility of compliance with the restriction by musicians. Although the Mayor said that the law was not intended to penalize street performers, he did not know whether a street performer could play music in compliance with the law.

### G. Lieutenant Grady

Lt. Grady testified about the way in which he enforces the 30-Foot Audibility Restriction. His usual practice is to wait for a complaint before approaching a street performer. He walks off the thirty-foot distance to verify the validity of the complaint. He will then approach a performer, but only during a break in the performance. As noted, Lt. Grady claimed he walked off a distance of over 100 feet before approaching Hassay about the noise generated by his musical performance.

In Lt. Grady's view, street performers are able to comply with the 30-Foot Audibility Restriction, which is beneficial for controlling sound levels. As he sees it, the restriction "gives ammunition" to address boardwalk noise. But, he acknowledged that most of the noise complaints involve music from boardwalk stores, rather than street performers.

Moreover, Lt. Grady conceded that, at the time Ocean City adopted the 30-Foot Audibility Restriction, it had a generally applicable prohibition on "unreasonably loud noise," set forth in § 30-271. He agreed that this provision allows the police department to restrict "unreasonably loud noise." Prior to 2012, Lt. Grady used a distance of fifty feet, rather than thirty feet, to determine whether music was unreasonably loud. And, prior to 2012, he had never issued a citation to Hassay for playing at an unreasonably loud level, nor had he ever arrested a street performer based on excessive noise.

*H. Milton Dean*

Milton Dean has been playing an electronic keyboard on the Ocean City boardwalk for about two years. Typically, he plays every day from Memorial Day to late September, from 11 a.m. to 3 p.m. and from 5 p.m. to 11 p.m.

Dean maintained that he is able to play in compliance with the 30-Foot Audibility Restriction, and that his business has increased since the ordinance was enacted. According to Dean, he could not hear his own music before the restriction. Since the enactment, "the ambient noise has gone down drastically." Dean testified that he checks his noise level by setting the keyboard to play itself, and then walking twenty or twenty-five feet away to listen. If it is too loud, he is able to adjust his volume by using the keyboard controls.

On cross-examination, Dean admitted that he does not like Hassay. In rebuttal, Chase testified that he had spoken to Dean on June 2, 2013, only one week before the preliminary injunction hearing. According to Chase, Dean said that he opposed the 30-Foot Audibility Restriction, but intended to support it at the Motion hearing because he does not like Hassay. Chase also measured the distance at which Dean's music was audible, using a tape measure. Chase claimed that he could hear Dean's music from a distance of sixty-five feet.

## II.    Standard of Review

"In order to receive a preliminary injunction, a plaintiff 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (quoting *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Pashby v. Delia*, 709 F. 3d 307, 320 (4th Cir. 2013); *Dewhurst v. Century Aluminum*

*Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (same). "[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of [the] plaintiff's First Amendment claim." *Musgrave*, 553 F.3d at 298 (citation omitted).

With respect to Hassay's claim of irreparable harm, I note that Hassay delayed filing the Motion until April 10, 2013, almost ten months after he was confronted by the OCPD. But, that date cannot be considered in a vacuum. On August 17, 2012, plaintiff's counsel at the ACLU contacted Ocean City in an effort to resolve the matter. Understandably, counsel waited for Ocean City to respond before pursuing legal action. However, no response was ever forthcoming. *See* Declaration of Deborah A. Jeon (ECF 206). Thereafter, the ACLU sought to obtain pro bono counsel for plaintiff, who represented to the Court that the delay in filing suit was occasioned, at least in part, by his other commitments and the need to research the issues before initiating litigation.

Moreover, what the Fourth Circuit said in *Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011), albeit in the context of permanent injunctive relief, is pertinent: "'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.* at 302 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (alteration in *Legend*). Ordinarily, such a threatened injury to the plaintiff will "easily outweigh[] whatever burden the injunction may impose," because the government "is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club*, 637 F.3d at 302-03.

In analyzing the criteria for a preliminary injunction, it is noteworthy that the preliminary injunction sought by plaintiff is narrowly limited to the enforcement of the 30-Foot Audibility

Restriction *on the boardwalk*. Plaintiff does not challenge enforcement of the 30-Foot Audibility Restriction at any other location. Further, if plaintiff were to prevail, Ocean City would retain its authority to prohibit "unreasonably loud noise" on the boardwalk, pursuant to § 30-271 of the Noise Ordinance.

Therefore, for the purpose of plaintiff's Motion, I shall focus largely on whether the record demonstrates plaintiff's likelihood of success on the merits. Defendants bear the burden of persuasion as to this issue. *See Chase*, 825 F. Supp. 2d at 617-18 (explaining that Ocean City bears the burden in justifying regulations challenged under First Amendment for both strict and intermediate scrutiny). If the 30-Foot Audibility Restriction does not satisfy the requisite level of scrutiny, plaintiff is likely to succeed on the merits. *See id.* at 218.

## III.  Discussion

The Free Speech Clause of the First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. CONST. amend. I. This provision, which is applicable to municipal ordinances through the Due Process Clause of the Fourteenth Amendment, *see Lovell v. Griffin*, 303 U.S. 444, 450 (1938), "strictly limit[s]" government entities "in their ability to regulate private speech in . . . 'traditional public fora.'" *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) (citation omitted).

It is well established that "[m]usic, as a form of expression and communication, is protected under the First Amendment." *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989); *see also IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 390 (4th Cir. 1993). In *Ward*, 491 U.S. at 790, the Supreme Court recognized the important role that music has historically played as "speech":

> Music is one of the oldest forms of human expression. From Plato's discourse in
> the Republic to the totalitarian state in our own times, rulers have known its

capacity to appeal to the intellect and to the emotions, and have censored musical compositions to serve the needs of the state. The Constitution prohibits any like attempts in our own legal order.

Indisputably, Hassay's music qualifies as protected speech, and Ocean City does not contend otherwise.[11] That Hassay receives "donations" for his performances does not alter the status of his musical expression, because protection under the First Amendment is not lost if the speech is "sold rather than given away." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 756 n.5 (1988); *see also Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 801 (1988) ("It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak."). Even when offered for entertainment purposes, and not political or ideological reasons, music is entitled to First Amendment protection. *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981) ("Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee."); *see also IOTA XI*, 993 F.2d at 390 ("Expression devoid of 'ideas' but with entertainment value may also be protected because '[t]he line between the informing and the entertaining is too elusive.'") (quoting *Winters v. New York*, 333 U.S. 507, 510 (1948)).

Additionally, it is undisputed that the Ocean City boardwalk qualifies as a traditional public forum. *See Chase*, 825 F. Supp. 2d at 614-15 (citing cases).[12] Public streets, sidewalks,

---

[11] The parties did not address whether a store's commercial use of amplified music constitutes artistic expression; that issue is not before me.

[12] For the purpose of analyzing restrictions of speech on public property, the Supreme Court has divided such property into various categories: the traditional public forum, the designated public forum, the limited public forum, and the non-public forum. *See Christian Legal Soc'y v. Martinez*, ___ U.S. ___, 130 S. Ct. 2971, 2984 n.11 (2010); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

and parks are the "archetype of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988). They occupy a "special position in terms of First Amendment protection" because, for "[t]ime out of mind," they "have been used for public assembly and debate." *Snyder v. Phelps*, ___ U.S. ___, 131 S. Ct. 1207, 1218 (2011) (citations and internal quotation marks omitted) (alteration in *Snyder*).

"In the traditional public forum, which includes the streets, sidewalks, parks, and general meeting halls, speakers' rights are at their apex." *Steinburg v. Chesterfield Cnty. Planning Comm'n*, 527 F.3d 377, 384 (4th Cir. 2008). Therefore, "'any restriction based on the content of . . . speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest.'" *Christian Legal Soc'y*, supra, 130 S. Ct. at 2984 n.11 (quoting *Pleasant Grove*, 55 U.S. at 469) (alteration in original). "A regulation that serves purposes unrelated to the content of expression is deemed [content] neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791; *see, e.g.*, *Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 47-49 (1986) (upholding zoning regulations for adult movie theaters against First Amendment challenge because regulations were justified by city's concern for "secondary effects" on surrounding neighborhoods, even though they "treat[ed] theaters that specialize in adult films differently from other kinds of theaters").

The government may impose reasonable "time, place, and manner" restrictions on speech—*i.e.*, restrictions that regulate the time, place, or manner of speech, but not its content—provided that the restrictions satisfy an intermediate level of scrutiny, rather than strict scrutiny. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 428 (1993); *Ward*, 491 U.S. at 791. In order to pass intermediate scrutiny, a "time, place, and manner" restriction on speech must (1) be "'justified without reference to the content of the regulated speech'"; (2) be

"'narrowly tailored to serve a significant governmental interest'"; and (3) "'leave open ample alternative channels for communication of the information'" that the speaker wishes to communicate. *Ward*, 491 U.S. at 791 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). Defendants bear the burden of showing that the regulation satisfies the applicable level of scrutiny. *See Chase*, 825 F. Supp. 2d at 617 (collecting cases); *accord Deegan v. City of Ithaca*, 444 F.3d 135, 142 (2d Cir. 2006) (holding that government bears the burden of showing the restriction is narrowly tailored and justified by the interest asserted).

Although "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests," and the regulation may not "burden substantially more speech than is necessary to further the government's legitimate interests," it "need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward*, 491 U.S. at 799 (internal citations and footnote omitted). In other words, "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800.

A. *Content Neutrality and Level of Scrutiny*

As a threshold matter, the parties dispute whether the 30-Foot Audibility Restriction is subject to strict scrutiny as a content-based restriction, or intermediate scrutiny as a content-neutral restriction.

According to Hassay, the restriction is content based because it sets a different threshold of audibility for sound generated by musical instruments and machines than sound generated by the human voice. As Hassay observes, yelling, shouting, hooting, whistling, or singing on the boardwalk is subject to a more lenient fifty-foot audibility restriction, as compared to the thirty-foot restriction for music or amplified sound. *See* Noise Ordinance § 30-272(2)c. Therefore, Hassay insists that Ocean City discriminates between one form of expression—instrument or machine-generated sound—and another form of expression—the human voice, and thus the ordinance is not content neutral. *See Discovery Network*, 507 U.S. at 429 (holding that city ban on newsracks that distribute commercial handbills, but not those that distribute newspapers, was a content-based regulation because "whether any particular newsrack falls within the ban is determined by the content of the publication resting inside the newsrack"). As noted, a content-based restriction on speech is subject to strict scrutiny under the First Amendment.

Defendants counter that the 30-Foot Audibility Restriction is imposed on all sound generated by musical instruments or amplifying devices, without regard to the message, and thus it "'is justified without reference to the content of the regulated speech.'" *Ward*, 491 U.S. at 791 (emphasis and citation omitted); *see id.* at 792 (finding that "city's desire to control noise levels at [Central Park's] bandshell events . . . to avoid undue intrusion into residential areas and other areas of the park . . . 'ha[s] nothing to do with content'") (citation omitted). In their view, the secondary effects of instruments or machine-generated sound differentiates those sounds from the human voice. In particular, defendants assert that machine-generated sound can be played

without stopping, whereas a person would tire from yelling or singing and thus the noise would subside.[13]

As I see it, I need not decide whether the 30-Foot Audibility Restriction is content based. Even assuming, *arguendo*, that it is content neutral, and therefore subject only to intermediate scrutiny, I am persuaded that Ocean City cannot satisfy that level of scrutiny. Specifically, the ordinance is not "'narrowly tailored to serve a significant governmental interest,'" and it does not "'leave open ample alternative channels for communication of the information'" sought to be conveyed. *Ward*, 491 U.S. at 791 (quoting *Clark*, 468 U.S. at 293).

*B. Narrowly Tailored to Serve a Significant Government Interest*

It is well established "that government 'ha[s] a substantial interest in protecting its citizens from unwelcome noise.'" *Ward*, 491 U.S. at 796 (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 806 (1984)) (alteration in *Ward*). Although this interest is at its height when protecting the "'well-being, tranquility, and privacy of the home,'" *Frisby v. Schultz*, 487 U.S. 474, 484 (1988) (quoting *Carey v. Brown*, 447 U.S. 455, 471 (1980)), "the government may act to protect even such public forums as city streets and parks from excessive noise." *Ward*, 491 U.S. at 796 (citing *Kovacs v. Cooper*, 336 U.S. 77, 86-87 (1949)); *see also United States v. Doe*, 968 F.2d 86, 89 (D.C. Cir. 1992). This interest is reflected in the Ocean City Municipal Charter, which authorizes the regulation of "excessive noise," City Code, Part I, Title XIV § C-1403B, as well as § 30-271 of the Noise Ordinance, which refers to protecting "the comfort, repose, health, peace or safety" of those in Ocean City from "unreasonably loud noise."

---

[13] This attempted distinction overlooks that a musician playing an instrument is probably as likely to tire as a person who is singing.

There is no dispute that the ongoing matter of the "battle of the bands" on the boardwalk contributes to a noise level that some find disturbing and disruptive. The question here is whether the 30-Foot Audibility Restriction satisfies the second prong of the intermediate scrutiny test, requiring the challenged regulation to be "narrowly tailored" to serve Ocean City's significant governmental interest in restricting excessive noise on the boardwalk. According to plaintiff, the ordinance is not narrowly tailored because, in effect, it imposes a total ban on musicians engaged in a form of protected expression.

A restriction is considered narrowly tailored if it "'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward*, 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1989)). As noted, "it need not be the least restrictive or least intrusive means of doing so," *Ward*, 491 U.S. at 798, and a court may not invalidate a regulation simply because it "concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800. However, a restriction may not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* at 799. Therefore, Ocean City "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.*

In evaluating whether a restriction is narrowly tailored, a court "must . . . take account of the place to which the regulations apply," including the "'nature'" of the forum and "'the pattern of its normal activities.'" *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 772 (1994) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972)). "'[E]xcessive' noise by definition means something above and beyond the ordinary noises associated with the appropriate and customary uses of the [forum]." *Doe*, 968 F.2d at 89. In other words, whether

the boardwalk noise proscribed by Ocean City is "excessive" must be evaluated by reference to "what is usual and customary" on the boardwalk. *Deegan*, 444 F.3d at 143; *see Doe*, 968 F.2d at 90 (explaining that "narrowly tailored" test "must be applied in a realistic manner which takes into account the nature and traditional uses" of the forum).

With respect to a public forum "bustling" with the sounds of activity and expression, an ordinance that prohibits sound no louder than most normal human activity is not narrowly tailored to restricting "excessive noise." *See Deegan*, 444 F.3d at 143-44 (finding noise ordinance violated First Amendment by prohibiting "any noise that can be heard 25 feet away" at public park, because it was not narrowly tailored); *Doe*, 968 F.2d at 90-91 (finding federal regulation violated First Amendment, as applied to Washington, D.C. park, by prohibiting sounds emitted by "audio devices" from exceeding sixty decibels at a distance of fifty feet, because it was not narrowly tailored).

*Deegan* is instructive. It involved a preacher's First Amendment challenge to a noise ordinance that prohibited, as "unreasonable noise," "any noise that can be heard 25 feet away" from its source. 444 F.3d at 140, 143. The ordinance affected the Ithaca Commons, a two-block "public pedestrian mall located in downtown Ithaca," which offered "walkways, benches, a playground, storefront businesses, restaurants, several pavilions, and a water fountain with nearby seating." *Id.* at 137. The Commons was also a "popular 'hang out'" for college students, as well as a performance venue for musicians and other live entertainment, the site of festivals, a host to "community events" drawing "thousands of visitors," such as festivals, and "a forum for demonstrations and protests highlighted by speeches, music performances, marches, and open discussion." *Id.* at 137, 143. Noting that the Commons was "a public forum bustling with the sounds of recreation, celebration, commerce, demonstration, rallies, music, poetry, speeches, and

other expressive undertakings," *id.* at 144, the Second Circuit observed, *id.* at 143: "These are not quiet pursuits that require a quiet atmosphere."

Applying the intermediate scrutiny test, the Second Circuit concluded that the ordinance violated the First Amendment. *Id.* at 144. It reasoned, *id.* at 143: "By targeting noise that is 'unreasonable,' Ithaca's noise regulations evince an intent to reach noise that exceeds what is usual and customary in a particular setting." The court noted that the ordinance "embrace[d] not only [the plaintiff]'s protected speech, but the sounds that typify the Commons and the activities it is meant to facilitate." *Id.* In particular, the court pointed out that "the decibel level of speech that would comply with the 25 foot rule was often lower than . . . the foot steps of a person in high heeled boots, conversations among several people, the opening and closing of a door, the sounds of a small child playing on the playground, or the ring of a cell phone." *Id.* Consequently, the court was of the view that the ordinance "restrict[ed] considerably more than is necessary to eliminate excessive noise." *Id.* It reasoned: "[A] noise regulation that prohibits 'most normal human activity,' including a spirited conversation by only two people, is not narrowly tailored to serve the City's interest in maintaining a reasonable level of sound, at least in a public forum like the Commons." *Id.*

In *Doe*, 968 F.2d 86, a protester in Washington, D.C.'s Lafayette Park was convicted for playing drums during an anti-war protest at a volume that violated a federal noise regulation for national parks. *Id.* at 87. The regulation prohibited sounds emitted by an "audio device," including a musical instrument, from exceeding sixty decibels at a distance of fifty feet. *Id.* The protester challenged her conviction on appeal, arguing that the regulation, as applied to Lafayette Park, violated the First Amendment. *Id.* Applying intermediate scrutiny, the D.C. Circuit

agreed, finding that the regulation was not "narrowly tailored to further the government's interest in preventing excessive noise in a national park that is also an acknowledged public forum." *Id.*

The court recognized that the "narrowly tailored" test "must be applied in a realistic manner which takes into account the nature and traditional uses" of the forum. *Id.* at 90. As it observed, Lafayette Park is far from tranquil, in contrast to other parks subject to the regulation. *Id.* at 89-90. Indeed, the court observed that Lafayette Park, situated close to the White House, is "a primary assembly point for First Amendment activity aimed at influencing national policies." *Id.* at 89. It noted that the park is "exposed to every form of urban commotion—passing traffic, bustling tourists, blaring radios, performing street musicians, [and] visiting schoolchildren." *Id.* And, the evidence showed that a "loud conversation" exceeded the sixty decibel limit at a distance of fifty feet, as did the electric generators regularly operating in the park. *Id.* at 90. In contrast, "the government offered no evidence . . . to show that anything above a 60-decibel sound volume would irritate or injure" others. *Id.* Accounting for the "nature and purposes of the setting" and "its ambient characteristics," the court found that the regulation was not "'narrowly tailored' to the government's interest in preventing excessive noise." *Id.* at 91.

Relying on *Ward*, defendants maintain that a regulation may not be invalidated "simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800. *Ward* involved sound regulations in New York City's Central Park that required a city technician to control the sound volume and sound mix of performances at the Central Park bandshell. *Id.* at 787-88. The regulations were intended, *inter alia*, to prevent "undue intrusion into residential areas and other areas of the park." *Id.* at 792. The challengers argued that the regulations were not narrowly tailored because, "by placing control of sound mix in the hands of the city's technician, the guideline

swe[pt] far more broadly than is necessary to further the city's legitimate concern with sound volume." *Id.* at 801.

The Second Circuit invalidated the regulation, concluding that there were less restrictive alternatives to satisfy the government's interest. *See id.* at 797-98. The Supreme Court reversed, stating: "The alternative regulatory methods hypothesized by the Court of Appeals reflect nothing more than a disagreement with the city over how much control of volume is appropriate or how that level of control is to be achieved." *Id.* at 800. According to the Court, it was enough that, "absent th[e] requirement, the city's interest would have been served less well." *Id.*

The Court emphasized, however, that the city's technicians ensured "the sound amplification [was] *sufficient to reach all listeners* within the defined concertground," *id.* (emphasis added), and the regulations were "interpreted to forbid city officials [from] purposely . . . select[ing] inadequate sound systems." *Id.* at 795. In other words, the restrictions in *Ward* altered the volume of music at the Central Park bandshell, but "ha[d] no material impact" on the performance. *Id.* at 800. The Court added, *id.* at 801 (emphasis added): "If the city's regulatory scheme had *a substantial deleterious effect* on the ability of bandshell performers to achieve the quality of sound they desired, respondent's concerns would have considerable force."

Defendants claim, as in *Ward*, that Ocean City's interest in reducing excessive noise "would . . . be[] served less well" absent the restriction, and therefore the restriction is narrowly tailored. *Id.* To be sure, witnesses testified that the 30-Foot Audibility Restriction has contributed to diminished noise on the boardwalk, and provides "ammunition" to fight the "battle of the bands." Nevertheless, defendants' reliance on *Ward* is unavailing.

Unlike the regulations in *Ward*, the 30-Foot Audibility Restriction effectively prohibits a musician from playing at a volume sufficient to reach his or her listeners intelligibly. According

to Ehrlich's unrebutted expert testimony, the boardwalk's background noise is approximately sixty decibels. For music to be intelligible to an audience standing fifteen feet from a performer, a musician would need to play at a level of seventy decibels. And, according to Ehrlich, music played at a level of seventy decibels would be "easily audible" at a distance of thirty feet. In other words, unlike in *Ward*, a musician cannot comply with the 30-Foot Audibility Restriction without playing so quietly that the music becomes unintelligible to the audience. Thus, as the testimony of Hassay, Young, and Chase reflected, a musician is unable to express himself through his music if playing at the required volume.

Like the parks at issue in *Deegan* and *Doe*, Ocean City's boardwalk is a robust, vibrant, bustling place for much of the year, and it caters to all forms—and volumes—of activity and expression. It is full of stores and vendors; it is a venue for "street performers" and events; portions of it are serviced by public transportation; and it features a panoply of tourist attractions. As one of Maryland's main summer destinations, the boardwalk is loud and crowded during the summer. It is not a destination for "quiet pursuits that require a quiet atmosphere." *Deegan*, 444 F.3d at 143.

Ocean City has adopted a *per se* standard that establishes as "unreasonably loud" the use of any musical instrument or sound amplification system audible at thirty feet. This level of noise falls well short of the noise created by the boardwalk's customary usage, including normal human activity. According to Ehrlich's expert testimony "virtually every sound" is audible on the boardwalk at a distance of thirty feet, including conversations, someone walking in flip flops, and seagulls. By reference to these sounds, a musical instrument or amplified music that is audible at thirty feet can hardly be considered excessive. *See Doe*, 968 F.2d at 89; *Deegan*, 444 F.3d at 143. Any claim to the contrary is belied by § 30-272(3)b of Ocean City's Noise

Ordinance, which prohibits the sound of voices as unreasonably loud only at a distance of fifty feet or more.

In effect, the 30-Foot Audibility Restriction is tantamount to a complete ban on the use of musical instruments and amplified sound on the boardwalk. *See, e.g., Lilly v. City of Salida*, 192 F. Supp. 2d 1191, 1194 (D. Colo. 2002) (finding that "25 feet limitation on the audibility of sound measured from [a] property line [wa]s so limiting that it constitute[d] a complete ban on the use of amplified sound for any form of speech"). In *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994), the Supreme Court explained: "Although prohibitions foreclosing entire media may be completely free of content or viewpoint discrimination, the danger they pose to the freedom of speech is readily apparent—by eliminating a common means of speaking, such measures can suppress too much speech."

Except in those rare circumstances in which "each activity within the proscription's scope is an appropriately targeted evil," *Frisby v. Schultz, supra,* 487 U.S. at 485, a complete ban is the very antithesis of a narrowly tailored law. *See Ladue*, 512 U.S. at 55 (recognizing "particular concern with laws that foreclose an entire medium of expression," and collecting cases in which complete bans were found to violate the First Amendment). Those circumstances are not present here, because the music prohibited by the 30-Foot Audibility Restriction is no louder than the sounds of normal human activity. As such, it is not an "appropriately targeted evil."

As indicated, defendants failed to offer any expert testimony to rebut Ehrlich's testimony. The subjective views of Mayor Meehan and Lt. Grady, neither of whom is an expert in acoustics, do not satisfy defendants' burden of showing that the restriction is narrowly tailored. Further, the testimony offered by Dean is not persuasive. Although Dean claimed to play keyboard at a

volume that complied with the restriction, there was contrary, credible evidence that his music was audible at a distance of sixty-five feet, in violation of the thirty-foot limit.

I do not question the legitimacy of defendants' interest in restricting excessive noise on the boardwalk. But, the means employed by Ocean City to achieve its goals reach far broader than necessary. The 30-Foot Audibility Restriction, which categorically prohibits music played at the level of "most normal human activity," *Deegan*, 444 F.3d at 143, is not narrowly tailored to prevent excessive noise. Therefore, the 30-Foot Audibility Restriction fails to satisfy the second prong of intermediate scrutiny.

### C. Adequate Alternative Channels for Communication

Defendants have the burden of showing that the 30-Foot Audibility Restriction "'leave[s] open ample alternative channels for communication'" of the regulated expression. *Ward*, 491 U.S. at 791 (citation omitted). These alternative channels must be available "within the forum in question." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981); *see Reno v. ACLU*, 521 U.S. 844, 880 (1997) ("'[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'") (quoting *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939)). Accordingly, defendants must demonstrate that the 30-Foot Audibility Restriction offers Hassay the ability to express himself on the boardwalk through his music.

Defendants claim that the 30-Foot Audibility Restriction leaves open alternative means of expression for music, because it is "merely a restriction of volume which allows music to be played at all times," albeit at lower sound levels. Opp. at 16. The record refutes defendants' position.

31

As discussed, *supra*, the 30-Food Audibility Restriction effectively prohibits a musician such as plaintiff from playing his music on the Ocean City boardwalk. The testimony of Hassay, Chase, and Young established that playing their music at a volume that complies with the restriction is not an adequate alternative means of communication; to the extent that Chase and Young continue to perform, they have altered their performance so substantially that, in effect, they can no longer communicate or express the emotions that they seek to impart to their audience.

The ordinance at issue in *Ladue* banned all residential signs. 512 U.S. at 54. Yet, the city claimed that residents "remained free to convey their desired messages by other means, such as hand-held signs, letters, handbills, flyers, telephone calls, newspaper advertisements, bumper stickers, speeches, and neighborhood or community meetings." *Id.* at 56 (internal quotation marks and citation omitted). The Supreme Court disagreed, stating:

> Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means. Precisely because of their location, such signs provide information about the identity of the speaker. As an early and eminent student of rhetoric observed, the identity of the speaker is an important component of many attempts to persuade. . . .
>
> Residential signs are an unusually cheap and convenient form of communication. Especially for persons of modest means or limited mobility, a yard or window sign may have no practical substitute. . . . Furthermore, a person who puts up a sign at her residence often intends to reach neighbors, an audience that could not be reached nearly as well by other means.

*Id.* at 56-57 (internal marks and citations omitted).

In contrast, the sign ordinance in *Brown* was lawful. It "permit[ted] residents to display up to two residential signs that 'shall not exceed five square feet per side in area and 42 inches in height,'" and also required that "wall signs" "'not exceed two square feet in area.'" 706 F.3d at

298 (citations omitted). Thus, unlike in *Ladue*, the ordinance did not effectuate a total ban on residential signage, and left open alternative means of communication. *See id.* at 305.

Moreover, a restriction need not be drafted as a total ban to prohibit, as a practical matter, a particular form of expression. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 573 (2001) (Thomas, J., concurring in part and concurring in the judgment) (noting that Massachusetts' restrictions on tobacco advertising within 1,000 feet of public playgrounds or schools had the "practical effect" of covering 90% of the state, and therefore were "little different from . . . a total ban"); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 525-26 (1981) (Brennan, J., concurring in judgment) ("[M]y view is that the *practical* effect of the San Diego ordinance is to eliminate the billboard as an effective medium of communication for the speaker"); *cf. United States v. Playboy Entertainment Grp., Inc.*, 529 U.S. 803, 812 (2000) ("The distinction between laws burdening and laws banning speech is but a matter of degree.").

To be sure, the defense witnesses testified that in their view a musician could comply with the restriction. But, defendants offered largely subjective beliefs. Although Dean claimed that he is able to comply with the restriction, his testimony was contradicted by credible testimony. He also has the ability to control manually with a button the volume of his keyboard, which a musician playing an acoustic instrument cannot do. As noted, the defendants bear the burden of showing that a challenged restriction satisfies intermediate scrutiny. *See Chase*, 825 F. Supp. 2d at 617; *accord Deegan*, 444 F.3d at 142. On this record, they have failed to do so.

\*    \*    \*

In the words of the Supreme Court, "[m]usic is one of the oldest forms of human expression." *Ward*, 491 U.S. at 790. Yet, by restricting the audibility of music on the boardwalk to a distance of thirty feet, Ocean City has effectively banned this form of expression from the

33

boardwalk, a traditional public forum. *Compare Ladue*, 512 U.S. at 54-57 (holding that total ban on all residential property signs did not leave open alternative means of communication, even though residents remained free to communicate, *inter alia*, via hand-held signs or advertisements), *with Brown v. Town of Cary*, 706 F.3d 294, 305 (4th Cir. 2013) (upholding ordinance regulating size, color and positioning of residential signs, because it left open alternative means of communication "by generally permitting residential signs subject to reasonable restrictions"). Accordingly, as applied to the Ocean City boardwalk, plaintiff has established a likelihood of success on the merits with respect to a violation of the First Amendment based on the 30-Foot Audibility Restriction.

In the absence of preliminary injunctive relief, plaintiff will suffer irreparable injury, in the form of deprivation of his right to freedom of expression, as guaranteed by the First Amendment. Further, the balance of the equities favors plaintiff, and an injunction is in the public interest. Accordingly, I will enter a preliminary injunction against the enforcement of the 30-Foot Audibility Restriction, as to the boardwalk, in accordance with Fed. R. Civ. P. 65.

## IV.    Security

Fed. R. Civ. P. 65(c) provides: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." This rule "is mandatory and unambiguous." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999). Ordinarily, "failure to require a bond upon issuing injunctive relief is reversible error." *Id.* Although a court "is not free to disregard the bond requirement altogether," a court "has discretion to set the bond amount 'in such sum as the court deems proper.'" *Id.*

"Security [under Fed. R. Civ. P. 65(c)] is generally fixed in an amount covering 'the potential incidental and consequential costs' as well as either the losses the wrongly enjoined party will suffer or the amount of the complainant's unjust enrichment during the period of prohibited conduct." *Metro. Reg'l Information Sys., Inc. v. Am. Home Realty Network, Inc.*, 904 F. Supp. 2d 530 (D. Md. 2012) (quoting *Hoechst*, 174 F.3d at 421). As discussed, *supra*, Ocean City will retain authority to prohibit "unreasonably loud noises" on the boardwalk pursuant to § 30-271 of the Noise Ordinance, and the 30-Foot Audibility Restriction will not be enjoined as to locations other than the boardwalk. Therefore, any costs suffered by defendants during the period of the preliminary injunction will be minimal or nonexistent. Accordingly, plaintiff shall be required to post only a nominal bond as security, which I will set in the amount of $1.00. *See Hoechst*, 174 F.3d at 421 n.3 ("Where the district court determines that the risk of harm is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly. In some circumstances, a nominal bond may suffice.") (internal citation omitted).

An Order consistent with this opinion follows.

Dated: July 3, 2013                           /s/
                                              Ellen Lipton Hollander
                                              United States District Judge